Rosemary FORTIN et al., Petitioners,

v.

F. Ray MARSHALL, Secretary, Department of Labor, United States of America, Respondent.

No. 79–1059.

United States Court of Appeals, First Circuit.

Submitted Sept. 14, 1979.

Decided Nov. 2, 1979.

Joanne M. Morris on brief pro se.

Carin Ann Clauss, Sol. of Labor, Ronald G. Whiting, Associate Sol., and John R. Garson, Washington, D. C., Counsel for International Affairs, on brief for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The issue in this case is whether forty Pan American World Airways (Pan Am) employees who lost their jobs when Pan Am stopped serving Boston on October 31, 1978, are entitled to compensation and other benefits under the worker adjustment assistance program of the Trade Act of 1974, 19 U.S.C. §§ 2101–2487. The employees have petitioned this court for review of the Secretary of Labor's decision that they are not eligible for assistance. 19 U.S.C. § 2322.

The worker adjustment assistance program is but one facet of the Trade Act of 1974. A comprehensive piece of legislation, the Trade Act was intended "to foster the economic growth of and full employment in the United States and to strengthen economic relations between the United States and foreign countries through open and nondiscriminatory world trade," 19 U.S.C. § 2102(1), as well as "to provide adequate procedures to safeguard American industry and labor against unfair or injurious import competition, and to assist industries, firms, workers, and communities to adjust to changes in international trade flows," 19 U.S.C. § 2102(4). Through this Act, Congress gave the President broad authority to negotiate trade agreements that would reduce or eliminate tariffs and other barriers to international trade. At the same time, recognizing that increased imports could burden some domestic industries, Congress provided adjustment assistance for workers, firms, and communities injured by import

competition. *UAW v. Marshall,* 189 U.S. App.D.C. 232, 233, 584 F.2d 390, 391 (D.C. Cir. 1978). A group of workers can qualify for benefits including compensation, employment services, training, and job search and relocation allowances, 19 U.S.C. §§ 2291–98, if the Secretary of Labor determines that three requirements are met:

(1) that a significant number or proportion of the workers in such workers' firm or appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272. *See Usery v. Whitin Machine Works, Inc.,* 554 F.2d 498, 500 (1st Cir. 1977).

It is the third eligibility requirement that concerns us here. In concluding that the Pan Am workers were ineligible for adjustment assistance, the Secretary determined that they performed a variety of passenger, cargo, mechanical, administrative and managerial tasks in the operation of Pan Am flights from Boston to London and that Pan Am was not involved in the production of an "article" within the meaning of section 222(3) of the Trade Act, 19 U.S.C. § 2272(3). 43 Fed.Reg. 59,176 (1978). This determination was in keeping with the Secretary's earlier decision, in similar proceedings brought in 1975 by the International Brotherhood of Teamsters on behalf of 691 Pan Am workers laid off in 1974, that Pan Am workers did not qualify for adjustment assistance because the air transportation services Pan Am provided were not "articles." 40 Fed.Reg. 54,639 (1975).

Although judicial review of the Secretary's 1975 decision was apparently not sought, the Boston Pan Am workers terminated in 1978 are asking that this court overturn the Secretary's interpretation of the third eligibility requirement and declare them eligible for adjustment assistance. In the brief filed on their behalf by their Teamsters Union shop steward, the workers contend that they lost their jobs to foreign competition. They explain that in July, 1977, the United States and Britain signed an agreement, known as the Bermuda II agreement, which contained a stipulation that only two United States cities would be allowed to have service to London provided by two United States airlines. Subsequently, New York and Los Angeles were given this "dual designation." On April 19, 1978, the Civil Aeronautics Board named Trans World Airlines as the single American airline to provide service from Boston to London and stripped Pan Am of its Detroit-Boston-London route. Pan Am withdrew from Boston after other operations from the city proved unprofitable. British Airways dramatically increased its share of the Boston-London market.

Concerning the Secretary's conclusion that Pan Am workers are ineligible for adjustment assistance because they do not produce "articles," the Boston workers simply contend that a service can be considered a product, and that the product Pan Am sells ("particular seat on a particular flight to a particular destination") should be considered an "article." On this point we also have the benefit of a detailed memorandum filed during the 1975 proceedings by a Teamsters attorney, who argued that the term "article" is expansive enough to include services and that extending benefits to service workers would be within the remedial intent of the Trade Act.*

We have found no judicial decisions concerning the eligibility of workers in service industries for adjustment assistance. In

---

* We treat this memorandum, which is included in the Appendix, as part of appellant's argument in this appeal.

deciding whether the workers' interpretation of the Act has any force, we focus first on the words of the statute itself. *E. g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 128 (1st. Cir.), *cert. denied sub nom. Baird v. Pratt,* 441 U.S. 952, 99 S.Ct. 2181–82, 60 L.Ed.2d 1057 (1979). To interpret air transportation services as "articles produced" within the meaning of 19 U.S.C. § 2272(3) is to strain severely, if not fracture, the statutory language. Although in advertising lingo, Pan Am might be said to sell a "product," we do not think air transportation service is a "product" or an "article" in the ordinary sense of these words. *Cf. Kaiser Aluminum and Chemical Corp. v. United States Consumer Product Safety Commission,* 574 F.2d 178, 180 (3d Cir.), *cert. denied,* 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978) (term "article" said to denote "any material thing"). *See generally Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975). Nor are we aware of any special commercial meaning of these terms that would include services. *See generally Trans-Atlantic Co. v. United States,* 471 F.2d 1397, 1398 (C.C.P.A.1973); 2A C. Sands, *Statutes and Statutory Construction* § 47.31 (4th ed. 1973). Nevertheless, we recognize that the Customs Court has said the term "article" is vague and varies according to context, *Close and Stewart v. United States,* 268 F.Supp. 466, 468–69 (Cust.Ct.1967), and that one dictionary definition of the word "article" ("a thing of a particular class or kind, as distinct from a thing of another class or kind," Webster's Third New International Dictionary (1976)), is broad enough to permit argument that services are included.[1]

When read in the context of the entire Trade Act, however, it becomes clear that the term "article" was plainly meant to refer to a tangible thing and not to a service. Although the Trade Act does not contain a definition of the word "article," the definitions sections contained in the Act's "General Provisions" is persuasive. 19 U.S.C. § 2481. There it is stated that, "for the purposes of this Act,"

> [a]n imported article is "directly competitive with" a domestic article at an earlier or later stage of processing, and a domestic article is "directly competitive with" an imported article at an earlier or later stage of processing, if the importation of the article has an economic effect on producers of the domestic article comparable to the effect of importation of articles in the same stage of processing as the domestic article.

19 U.S.C. § 2481(5). A product of a country or area is defined as an article which is the growth, produce, or manufacture of such country or area. 19 U.S.C. § 2481(8). Finally, the term "commerce" is said to include services associated with international trade. 19 U.S.C. § 2481(10).

Other sections of the Trade Act confirm that the term "article" was used in a somewhat restrictive sense to refer to a thing and that the terms "commerce," "trade," and "services" were used when Congress meant to refer to services. On one hand, throughout the Act, an article is referred to as something that can be the subject of a duty. *E. g.,* 19 U.S.C. §§ 2119, 2132, 2135, 2151, 2436, 2461, 2463. In one section, an article is spoken of as something that can be placed in a warehouse. 19 U.S.C. § 2253(g). On the other hand, in a section authorizing the President to negotiate trade agreements with an eye toward reducing barriers to international trade, 19 U.S.C. § 2112, "international trade" is defined to include trade in both goods and services. 19 U.S.C. § 2112(g). Another section empowers the President to withdraw trade agreement concessions, impose duties or other import restrictions on foreign goods, and impose fees and restrictions on foreign services, once he determines that a foreign country's tariffs and other import restrictions or its export subsidies and other policies unfairly burden United States com-

---

1. *Close and Stewart v. United States,* 268 F.Supp. 466, 468 (Cust.Ct.1967) referred to this definition, but did not suggest the term "arti- cle" is broad enough to encompass services. *See also United States v. A. Johnson and Co., Inc.,* 588 F.2d 297, 300 (C.C.P.A.1978).

merce; "commerce" being defined to include services associated with international trade. 19 U.S.C. § 2411(a). Another provision, which allows the President to enter into bilateral commercial agreements extending non-discriminatory (most favored nation) treatment to products of countries formerly denied such treatment, specifies that these agreements may be renewed if a satisfactory balance of concessions in trade and services has been maintained. 19 U.S.C. § 2435.

All of this leads to the conclusion that the term "article" as used throughout the Trade Act, was not meant to include services, and supports the Secretary's determination in this case that services of the type rendered by Pan Am were not "articles" within the meaning of the worker adjustment assistance eligibility requirement set forth in 19 U.S.C. § 2272(3). There is a presumption that the same words used in different parts of an act have the same meaning. E. g., *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); *United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978); *Hotel Equities Corp. v. Commissioner,* 546 F.2d 725, 728 (7th Cir. 1976).

Only if the workers could overcome this presumption by showing that the term "article" was intended to be used in a more expansive sense in the adjustment assistance provisions of the act, *see, e. g., Atlantic Cleaners & Dyers, Inc. v. United States, supra,* 286 U.S. at 433, 52 S.Ct. 607; *Hotel Equities Corp. v. Commissioner, supra,* at 728, or could demonstrate that an interpretation of the act denying them adjustment assistance would be plainly at variance with the policy of the legislation, *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Preterm, Inc. v. Dukakis, supra,* 591 F.2d at 128, would we be persuaded

to depart from the apparently plain meaning of the statute, which is ordinarily controlling, *see Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The workers' arguments do not convince us.[2]

The workers emphasize that one of the express purposes of the act is "to assist . . . workers . . . to adjust to changes in international trade flows," 19 U.S.C. § 2102(4), and that one of the act's principal House sponsors, Representative Ullman, said in calling up the conference report that the adjustment assistance program was intended to protect workers and industries that have been "adversely affected by trade." 120 Cong.Rec. 41,796–97 (1974). Since the word "trade" was used during the legislative process to include trade in services, S.Rep.No.93–1298, 93d Cong., 2d Sess. 45 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7186, 7217, and so used in the Trade Act itself, 19 U.S.C. § 2112(g)(3), the Pan Am workers claim that employees of service industries were meant to be eligible for adjustment assistance. However, when placed alongside the more restrictive language used in the adjustment assistance provisions themselves, these references to "trade" are not compelling evidence that Congress intended to cover service industry employees.

The workers also point out that, in enacting the Trade Act, Congress found that the original worker adjustment assistance program created by the Trade Expansion Act of 1962, Pub.L.No. 87–794, 76 Stat. 872 (current version begins at 19 U.S.C. § 1801) had been ineffective and replaced it with a new, streamlined program having more liberal eligibility requirements to be administered by the Labor Department. S.Rep.No.93–1298, 93d Cong., 2d Sess. 131 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7186, 7273; H.R.No.93–571, 93d Cong., 1st Sess. 52–53 (1973).[3] It is true that the Trade Act eliminated the Trade Expansion

---

**2.** Here, we are referring to the arguments advanced in the 1975 proceedings.

**3.** For a discussion of the worker adjustment assistance program of the Trade Act Expansion

Act of 1962 and its legislative antecedents, *see United Shoe Workers of America, AFL–CIO v. Bedell,* 165 U.S.App.D.C. 113, 506 F.2d 174 (D.C. Cir. 1974).

Act requirement that workers seeking adjustment assistance show (1) a causal link between increased imports and trade agreement concessions, and (2) that increased imports were a "major cause" of separation; the second requirement was replaced with one mandating a lesser showing that increased imports "contributed importantly" to the separations. *Compare* 19 U.S.C. § 2272 *with* Pub.L.No. 87–794, § 301, 76 Stat. 883 (repealed 1975). However, like the Trade Act, the Trade Expansion Act speaks in terms of assisting workers whose jobs were threatened or lost because of increased imports of "an *article* like or directly competitive with an *article produced* by such workers' firm, or an appropriate subdivision thereof." *Id.* (emphasis added). There is no indication that, in liberalizing adjustment assistance eligibility requirements in the Trade Act, Congress meant to adopt an expansive interpretation of "article" and to extend coverage to employees of service industries.

The Pan Am employees further point out that the Trade Act of 1974 was enacted nearly contemporaneously with the International Air Transportation Fair Competitive Practices Act of 1974, Pub.L. 93–623, 88 Stat. 2102 (1975) (codified in and amending scattered sections of 22, 49 U.S.C.). The fact that Congress legislated in one act against unfair practices that had hampered United States airlines does not, however, demonstrate that United States airline employees injured by foreign competition are entitled to adjustment assistance under another act.[4]

■ Finally, the Pan Am workers contend that the Trade Act's adjustment assistance provisions are to be construed liberally because that part of the Trade Act is remedial in nature. We agree with this general proposition and sympathize with the plight of the workers in this case, but

we are not free to rewrite the adjustment assistance provisions to include them. *See United Shoe Workers of America, AFL–CIO v. Bedell,* 165 U.S.App.D.C. 113, 127, 506 F.2d 174, 187 (D.C. Cir. 1974).

*The decision of the Secretary of Labor is affirmed.*

---

**4.** The Senate report accompanying the bill that became the Trade Act of 1974 also manifests Congress' concern about discrimination against the United States transportation service industries and its desire that this be the subject of negotiation and other Presidential action. S.Rep.No.93–1298, 93d Cong., 2d Sess. 74, 102, 114, 165, 208 (1974), *reprinted in* [1974] U.S. Code Cong. & Admin.News, pp. 7186, 7224, 7259, 7303, 7340. But the report does not show that Congress intended to extend adjustment assistance to firms and workers in the air transportation industry.