**Robert W. PEMBERTON, et al., Petitioners,**

v.

**F. Ray MARSHALL, Secretary, Department of Labor, United States of America, Respondent.**

No. 79–2173.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 9, 1980.

Decided Jan. 14, 1981.

Harry Goldman, Jr., Baltimore, Md., of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, with whom Lester W. Bridgeman, Washington, D. C., was on the brief, for petitioners.

Diddo Ruth Clark, Atty., U. S. Dept. of Labor, Washington, D. C., with whom John R. Garson, Atty., U. S. Dept. of Labor, Washington, D. C., was on the brief, for respondent.

Before TAMM and ROBINSON, Circuit Judges, and HARLINGTON WOOD, Jr.,* U. S. Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Circuit Judge WOOD.

WOOD, Circuit Judge:

This is an appeal of an order of the Secretary of Labor denying trade adjustment assistance to workers employed by Bethlehem Steel Corporation at its Baltimore Yards, one of several Bethlehem facilities in the Chesapeake Bay Area. Under Subchapter II, Part 2, of the Trade Act of 1974, 19 U.S.C. § 2272 (1975),[1] workers may be certified eligible for assistance if it is determined.

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

Certification was denied because it was determined that the workers' firm, the Baltimore Yards, does not produce an article but instead provides the services of repair and maintenance of marine vessels. Certification could be granted only if (1) the services were provided in conjunction with the production of an article adversely affected by imports and (2) the workers' separations were the result of reduced demand due to the imports for these services by the parent firm, an appropriate subdivision or a firm related by control or ownership. The Secretary denied eligibility under that criterion since ninety-four percent of appellants' work consisted of services to customers totally unrelated to the parent firm, Bethlehem Steel Corporation, and in particular its Sparrows Point Shipyard.

In their request for administrative reconsideration,[2] appellants argued that the earlier certification for workers assistance of the Sparrows Point Shipyard,[3] a subdivision of Bethlehem Steel engaged in shipbuilding, required certification of the Baltimore Yards. Noting similarities in contracts, benefits and seniority, appellants reasoned that the identity of interests and functions between the two groups necessitates equal treatment. The Secretary rejected this contention, pointing to the crucial difference between the facilities: the workers at Sparrows Point produce an article, ships, while those at the Baltimore Yards do not. The application was denied and this appeal followed.

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

1. Pub.L.No. 93–618, 88 Stat. 1978.

2. 29 C.F.R. 90.18 (1977).

3. 44 Fed.Reg. 19067 (March 30, 1979).

Appellants offer no new arguments on appeal, but assert error in the findings of the Secretary that (1) repaired ships are not articles within the meaning of § 2272(3) and (2) the Baltimore Yards is a separate subdivision from Sparrows Point and does not merit equal treatment. We find no error in these conclusions and affirm the order denying eligibility.

The investigation of the Department of Labor disclosed that the operations of the Baltimore Yards mainly involved maintenance and repairs of marine vessels owned by companies other than Bethlehem Steel. Only six percent of the total activity of the yards was devoted to work for various Bethlehem Steel facilities: a hull and blast furnace hatch cover were fabricated for the Sparrows Point Yard and some repairs were made on an ore carrier chartered by the parent company. It was noted by the field investigator that these activities were done "only when the other Bethlehem facilities are overbooked or . . . have experienced breakdowns or when the equipment is too small to handle a certain job."

Appellants categorize the work of their facility as "remanufacture" and suggest that there is no difference between their activity and the initial creation of a ship. Stressing the remedial nature of the Act, they contend that it would be inconsistent to deny certification in this instance. While it is true that the assistance provisions are to be construed liberally, *United Shoe Workers of America v. Bedell*, 506 F.2d 174, 187 (D.C.Cir.1974), the parameters cannot be ignored. The benefits of the Act are not universal and some hardships may result. *See, e. g., Machine Printers and Engravers Association v. Marshall*, 595 F.2d 860 (D.C. Cir.1979); *United Shoe Workers of America v. Bedell*, 506 F.2d 174 (D.C.Cir.1974).

■ The Act requires the manufacture of an article the demand for which is decreased by the importation of a like article. The legislative history of the Act offers no specific guidance on the interpretation of the term "article," but a reading of the entire statute, its purposes and goals, leaves no doubt that Congress contemplated an equalization of markets for domestic goods. The repair and maintenance of a ship is clearly a service to an existing commodity. Even if the repair necessitates the use of new materials, it cannot be said to be the creation of a new ship any more than overhauling an automobile can be said to be manufacturing a car.[4] Semantics do not overcome the reality that nothing new is entered into the stream of commerce.

*Fortin v. Marshall*, 608 F.2d 525 (1st Cir. 1979), leaves no doubt that services do not fall within the terms of § 2272. In that case, employees of Pan American Airways sought adjustment assistance when a trade agreement with Great Britain resulted in the loss of their London-Boston route to British Airways. The court carefully considered the use of the word "article" throughout the Trade Act, *id.* at 527–28, and concluded that transportation service could not be considered an article. Appellants contend that *Fortin* is distinguishable because in that case nothing tangible was produced. In our situation, the service did involve a tangible item—a ship—but the *same* item was also the end product. There was no transformation, but a mere refurbishing of what already existed.

■ Even if we accept that material items were created, they can only be described as customized parts for marine vessels. In order to fall within the statutory language, the increased imports of like articles—similar fabrications—would have to be shown. Nowhere is such a claim made; appellants instead assert that imported new ships are the cause of the decline in business. But the completed product cannot be considered a "like article" to a component part. This court examined this issue exhaustively in *United Shoe Workers of America v. Bedell*, 506 F.2d 174 (D.C.Cir.

---

4. Although the appellants in their Petition for Adjustment Assistance describe as part of their work "jumboizing" of various ships, the investigation disclosed that no such activities had been carried on in the recent past. However, it is doubtful that even this activity would qualify under the Trade Act as the production of an article.

1974). In that case, the business of a manufacturer of shoe counters was diminished because the increased importation of shoes reduced domestic demand for counters. Certification was denied because the counters were not "like articles" to completed shoes but merely component parts.

■ Appellants' contention that the Baltimore Yards must be considered part of the "appropriate subdivision" which includes the Sparrows Point facilities is also without merit. The numerous similarities between the two facilities in management and policy do not negate the fact that the workers do not build ships at the Baltimore Yards while those at Sparrows Point do.

The definition of "appropriate subdivision" contained in the regulations promulgated under the Trade Act is clear:

"Appropriate subdivision" means an establishment in a multi-establishment firm which produces the domestic articles in question or a distinct part or section of an establishment (whether or not the firm has more than one establishment) where the articles are produced. The term "appropriate subdivision" includes auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities.

29 C.F.R. § 90.2 (1977). The only relevant concern in determining whether a facility is part of the appropriate subdivision is whether it also produces the articles in question. Workers at the Sparrows Point Yard were engaged in the manufacture of ocean-going vessels and were certified because of increased foreign construction of new ships. The repair and maintenance work which constituted ninety-four percent of the work at the Baltimore Yards had nothing to do with the creation of the new vessels at Sparrows Point.

This issue was squarely addressed in *Paden v. Department of Labor*, 562 F.2d 470 (7th Cir. 1977). *Paden* involved an application for assistance by workers at a Motorola plant which produced sound equipment and televisions. Increased imports of color televisions led to the eventual closing of the plant. The workers urged a broad interpretation of the term "appropriate subdivision" to include the entire plant since all its employees were affected. The court rejected this interpretation, concluding that it would "in practicality destroy all distinctions between product lines when throughout the Trade Act Congress carefully limited relief to injury from articles 'like or directly competitive.'" *Id.* at 475.

■ Appellants next suggest that the fabrication done for Sparrows Point makes the Baltimore Yards an "auxiliary facility" operating in conjunction with Sparrows Point for the production of new ships. However, the record shows that only a very small portion of the work done at the Baltimore Yards was of this nature. Furthermore, these tasks were assigned to the Baltimore Yards only when no other facility was available. It would strain all reasonable interpretations of the Trade Act to include as an auxiliary facility one which devotes less than six percent of its activities to the production of the articles in question.

In addition, a decline in the work at the Baltimore Yards could not have been "importantly caused" by the reduced demand from Sparrows Point. Even a *complete termination* of requests from Sparrows Point would affect less than six percent of the total output. "A cause must be significantly more than *de minimus* to have contributed importantly ..." S.Rep.No.93–1298, 93rd Cong., 2d Sess. 133, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7186, 7275. *See United Glass and Ceramic Workers v. Marshall*, 584 F.2d 398 (D.C.Cir.1978).

Finally, appellants contend that the Secretary did not fulfill his statutory obligation to investigate and that the decision was not based on substantial evidence. However, the information appellants suggest is lacking would be irrelevant to the determination to be made. Whether or not the contracts and benefits for workers at the Sparrows Point Yard are similar to those at the Baltimore Yards, the work is not the same. Nor is the effect on repair work of overseas shipbuilding relevant to the Secretary's decision. The important

facts are the nature of the work done at the facility and its relation to the production of an article. The investigation focused on these areas and disclosed ample information upon which to make a determination.

The Baltimore Yards employed approximately 1,000 workers whose primary responsibility was commercial repair. "The yards paint and repair tankers, cargo vessels and container ships. The repairs consist of engine repairs including prop damage as well as shell damage.... In addition the Baltimore Yards have drydocking facilities wherein they can clean barnacles of the hull, scrape and paint if need, repair hull damage below the water line." The investigation disclosed that ninety-four percent of the work at the facility consisted of the above listed activities. From these facts, it is reasonable to conclude that the nature of the work is service and not manufacture.

With regard to the relationship between the shipbuilding facility at Sparrows Point Yard and the work being done at the Baltimore Yards, the investigation disclosed that it was minimal. The total year's work for the Sparrows Point facility consisted of one hull fabrication and a blast furnace hatch cover. The Baltimore Yards were not used regularly and did not provide any usual service necessary to the shipbuilding operation. The other customers were totally unrelated to the Baltimore Yards by ownership or control. These facts are uncontroverted and reasonably lead to the conclusion that the decline in work at the Baltimore Yards was not related to the reduced demand for its services in conjunction with shipbuilding at the Sparrows Point Shipyard.

As the findings of fact by the Secretary are supported by substantial evidence, the order denying eligibility for benefits under the Trade Act of 1974 is

*Affirmed.*