Julian R. WOODRUM, Dennis Dorsey, and Sherman Johnson, Plaintiffs,

v.

Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Defendant.

Court No. 80–12–00105.

United States Court of International Trade.

May 10, 1983.

Adler & Baker, Beckley, W.Va., for plaintiffs; Robert S. Baker, Beckley, W.Va., of counsel.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., Sheila N. Ziff, New York City, for defendant.

*On Plaintiffs' Motion Pursuant to Rule 56.1 for Review of Administrative Determination upon Agency Record*

RE, Chief Judge:

In this action, plaintiffs, on behalf of the former employees of Capital Chrysler Plymouth of Montgomery, Inc., of Montgomery, West Virginia, challenge a determination by the Secretary of Labor denying them certification of eligibility for benefits under the worker adjustment assistance program of the Trade Act of 1974, 19 U.S.C. §§ 2101–2487 (1976). In substance, the Secretary found that plaintiffs were service workers employed by a firm that did not produce an article within the meaning of

section 222(3) of the Trade Act of 1974, 19 U.S.C. § 2272(3) (1976).

On July 26, 1982, this court, in *Woodrum v. Donovan,* 3 CIT ——, 544 F.Supp. 202 (1982), *rehearing denied, Woodrum v. Donovan,* 4 CIT ——, Slip Op. 82–78 (September 17, 1982), remanded the case to the Secretary of Labor for further administrative proceedings. This court held that the Secretary's failure to comply with the procedural requirements of the statute had prejudiced plaintiffs' rights. Specifically, the Secretary was instructed to conduct a factual inquiry as to the ownership of Capital Chrysler Plymouth and the nature of the work performed by plaintiffs, and make a redetermination regarding plaintiffs' eligibility for benefits.

In compliance with the court's order, the Secretary conducted an investigation, and on November 10, 1982, submitted a redetermination and supplemental administrative record. The Secretary's investigation disclosed that plaintiffs were engaged in the preparation and servicing of new Chrysler automobiles prior to their retail sale by Capital Chrysler Plymouth. Moreover, it established that plaintiffs' employing firm was an independently owned and operated automobile dealership. The Secretary again denied plaintiffs' petition for certification of eligibility for benefits because, in the Secretary's view, plaintiffs were service workers employed by a firm that did not produce an article within the meaning of section 222(3). 47 Fed.Reg. 49116 (Oct. 29, 1982).

After reviewing the original and supplemental administrative records and the arguments and briefs of the parties, the court holds that the Secretary's denial of certification is supported by substantial evidence and in accordance with law.

The Secretary of Labor is required to certify a petitioning group of workers as eligible for trade adjustment assistance benefits if he determines:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with *articles produced* by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production. [Emphasis added.]

Trade Act of 1974, § 222, 19 U.S.C. § 2272 (1976).

Plaintiff's petition was denied because it failed to satisfy the third eligibility criterion, *i.e.,* plaintiffs' employer, Capital Chrysler Plymouth, did not produce an article that had been adversely affected by increased imports.

In this action, plaintiffs' principal contention is that the Secretary of Labor misconstrued section 222(3) by interpreting narrowly the term "produced" to apply only to workers manufacturing the import-impacted articles. In particular, plaintiffs claim that, regardless of the nature of their work, the court should consider them as part of the production process for new Chrysler automobiles because their labor was essential to the final delivery of those automobiles to the general public. Plaintiffs further claim that they actually performed installation and assembly procedures which were a necessary part of the production process.

Plaintiffs also submit that the Secretary's interpretation of section 222(3), as a practical matter, has resulted in dissimilar treatment of similarly situated workers. Plaintiffs complain that the Secretary's determination invidiously discriminates, with respect to the receipt of trade adjustment assistance benefits, between employees of automobile dealerships controlled or substantially owned by automobile manufacturing companies, and employees of independently owned dealerships.

On remand, in support of their petition, the named plaintiffs offered affidavits describing the nature and extent of their duties at Capital Chrysler Plymouth. In their affidavits, plaintiffs Woodrum and Johnson stated that they were mechanics for the subject firm. As part of their work, they inspected and prepared new Chrysler cars prior to their retail sale. They made all final adjustments on the automobiles, "including setting the timing, front end alignments, checking the oil, inspecting the rods, tightening the wheels, and other tasks." If any mechanical defects existed in the automobiles, plaintiffs Woodrum and Johnson repaired them. On occasion, these repairs consisted of the replacement of defective engines, transmissions and differentials. Plaintiffs also were responsible for the installation of some dealer options, such as radios.

Plaintiff Dorsey's affidavit disclosed that he was a lot boy, who also inspected and prepared new Chrysler cars for Capital Chrysler Plymouth prior to their retail sale. He performed many of the same routine adjustments to the new cars as plaintiffs Woodrum and Johnson. Plaintiff Dorsey stated that employees of Capital Chrysler Plymouth installed various dealer options, such as radios, air conditioning, power steering and brakes, clocks, cruise control and racing stripes. However, nowhere in his affidavit did plaintiff Dorsey indicate that he installed any of these dealer options.

All three plaintiffs indicated that Chrysler Corporation paid Capital Chrysler Plymouth between $40 and $100 per automobile for the final inspection and "prep" work. Plaintiffs claimed that without the work they performed on new Chrysler cars prior to retail sale, those vehicles were unfinished and not suitable for sale as new cars. In essence, plaintiffs argue that their efforts constituted the final link in the production process. Hence, they submit they are entitled to be certified as eligible for worker adjustment assistance benefits. Plaintiffs maintain that their expansive reading of the term "produced" is consistent with the remedial purpose of the trade adjustment assistance program of the Trade Act of 1974.

In rendering a negative determination upon reconsideration of plaintiffs' petition, the Secretary found that the Chrysler Corporation produced finished articles, automobiles, ready for the retail trade and not semi-finished units requiring further substantial assembly. According to the Secretary, plaintiffs' work or activity at Capital Chrysler Plymouth consisted of adjustment and preparation of already finished automobiles and did not constitute production within the meaning of section 222(3) of the Act. Rather, plaintiffs serviced finished articles.

The Secretary also found that plaintiffs' employing firm was an independently owned and operated dealership and was not substantially owned or controlled by Chrysler Corporation, which produced the finished article. Therefore, Chrysler Corporation could not be regarded as the petitioning "workers' firm" within the context of section 222(3).

The court may review a decision by the Secretary of Labor denying a petition for certification of eligibility for trade adjustment assistance benefits to assure that the Secretary's determination has been made in accordance with law, and is supported by substantial evidence contained in the administrative record. 19 U.S.C. § 2395(b) (Supp.IV 1980). The ownership of Capital Chrysler Plymouth and the kinds of work performed there are not in dispute. Therefore, the question presented in this case is whether, in finding that plaintiffs were not eligible for benefits because their firm did not produce an import-impacted article, the Secretary of Labor correctly interpreted and applied section 222(3) of the Trade Act of 1974.

When construing a statute, the duty of the court "is to give effect to the intent of Congress." *Flora v. United States,* 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958). The court must seek to discern the legislative will, first, by reference "to the literal meaning of the words employed."

*Id. See also Fortin v. Marshall,* 608 F.2d 525, 527 (1st Cir.1979). If a literal reading of the disputed provision does not answer the question presented, the court may look to the entire statutory scheme and to the provision's legislative history in an effort to resolve the ambiguity. *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.,* 545 F.2d 754, 756–57 (1st Cir.1976); *S.C.M. Corp. v. United States,* 80 Cust.Ct. 226, 243, C.R.D. 78–2, 450 F.Supp. 1178, 1190 (1978).

It is also true that "[t]he interpretation put on the statute by the agency charged with administering it is entitled to deference." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). *See also United Glass & Ceramic Workers of North America, AFL–CIO v. Marshall,* 584 F.2d 398, 407 (D.C.Cir. 1978). Courts, however, "must reject administrative constructions of the statute, whether reached by adjudication or rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Federal Election Commission,* 454 U.S. at 32, 102 S.Ct. at 42. "[I]t is for the courts, to which the task of statutory construction is ultimately entrusted, to determine whether or not administrative interpretations are consistent with the intent of Congress and the words of the Act." *United States v. New England Coal and Coke Co.,* 318 F.2d 138, 143 (1963).

■ The Secretary maintains that the words "articles produced", under section 222(3), do not embrace the performance of services unrelated to the production of a tangible article. *Pemberton v. Marshall,* 639 F.2d 798 (D.C.Cir.1981); *Fortin, supra.* The Secretary further contends that the trade adjustment assistance provisions of the Trade Act of 1974 require "the manufacture of an article the demand for which is decreased by the importation of a like article." *Pemberton,* 639 F.2d at 800.

In *Fortin,* former employees of an airline appealed the denial of their petition for certification of eligibility for trade adjust-ment assistance benefits. The court concluded that services were not "articles" as that term is used in section 222, and affirmed the Secretary's finding that, by performing a variety of passenger, cargo, mechanical, administrative and managerial tasks, the airline employees provided services rather than produced articles for consumers. Consequently, the airline employees could not be certified as eligible for trade adjustment assistance benefits.

In *Pemberton,* the petitioning workers performed repairs and maintenance on marine vessels at Bethlehem Steel Corporation's Baltimore Yards. The Secretary found that the Baltimore Yards did not sell or otherwise place into the stream of commerce any "article" which had been impacted adversely by increased imports. The employees merely repaired and serviced articles which were already part of the stream of commerce. On the facts presented, the Secretary determined that the work of the Bethlehem employees was not provided in conjunction with the production of an article adversely affected by imports. In affirming the Secretary, the Court of Appeals for the District of Columbia Circuit stated:

The repair and maintenance of a ship is clearly a service to an existing commodity. Even if the repair necessitates the use of new materials, it cannot be said to be the creation of a new ship any more than overhauling an automobile can be said to be manufacturing a car.

*Fortin* * * * leaves no doubt that services do not fall within the terms of § 2272. * * * Appellants contend that *Fortin* * * * is distinguishable because in that case nothing tangible was produced. In our situation, the service did involve a tangible item—a ship—but the *same* item was also the end product. There was no transformation, but a mere refurbishing of what already existed. [Emphasis in original.] [Footnote omitted.]

*Pemberton,* 639 F.2d at 800.

Plaintiffs contend that neither *Fortin* nor *Pemberton* controls because, unlike the case at bar, the workers in those cases were not

part of the production process. Plaintiffs also submit that, to the extent that *Pemberton* requires the manufacture of an article, it is wrongly decided. In their view, the Trade Act of 1974 only requires that the subject firm be a part of the production process. Plaintiffs do not claim to have manufactured new Chrysler automobiles. Nevertheless, they maintain that the record reveals that they are part of the production process because their labor was essential to the delivery of the import-impacted article to the public, and thus into the stream of commerce.

In support of their interpretation of the term "produced", plaintiffs call the court's attention to the legislative history of the Trade Act of 1974. Specifically, reference is made to section 2 of the Trade Act of 1974, 19 U.S.C. § 2102 (1976), which provides, in pertinent part:

The purposes of this Act are,

\* \* \* \* \* \*

(4) to provide adequate procedures to safeguard American industry and labor against unfair or injurious import competition, and to assist industries, firms, workers, and communities to adjust to changes in international trade flows; * *.

Moreover, plaintiffs stress that those portions of the Act providing for adjustment assistance for workers created a new program to provide assistance for all workers injured by increased imports of articles. They point to the House and Senate reports accompanying the 1974 Act. The House Ways and Means Committee stated:

The provisions of your committee's bill relating to adjustment assistance for workers differ to such an extent from those of the Trade Expansion Act which they would replace that they can reasonably be viewed as establishing a new program in place of the present one. In the opinion of the committee, the present program has proved to be inadequate and disappointing.

H.R.Rep. No. 571, 93rd Cong., 1st Sess. 52 (1973). At another point, the Committee report states that:

The bill liberalizes existing criteria for determinations respecting the eligibility of industries for import relief, and firms or workers for adjustment assistance * *.

For firms and workers, an affirmative determination of eligibility to apply for adjustment assistance may be made if it is found that increased imports have contributed importantly * * * to a decline in sales or production and to the total or partial separation of a significant proportion of the workers in question.

*Id.* at 8.

In its statement of purposes, the Senate Finance Committee found that Congress needed:

\* \* \* \* \* \*

(10) To provide greater access and more effective delivery of import relief to industries, firms and workers which are seriously injured or threatened with serious injury by increased imports;

(11) To establish a program of adjustment assistance for communities adversely affected by imports, to expand investment and employment opportunities in such communities, and to improve existing adjustment assistance programs for workers and firms.

S.Rep. 1298, 93rd Cong., 2d Sess. 8, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7187. Finally, in discussing the principal features of the trade adjustment assistance program, the Finance Committee stated:

Under the worker adjustment assistance provisions approved by the Committee, workers in a firm would qualify for trade adjustment benefits if the Secretary of Labor, within sixty days after the filing of a petition, finds that an absolute increase in imports *contributed importantly* to the workers' unemployment, and to a decrease in sales or production of the firm from which they have become unemployed. [Emphasis in original.]

*Id.* at 7205.

Plaintiffs maintain that these legislative pronouncements evince a Congressional intent to provide broad protection and assist-

ance to all workers who become unemployed as a result of increased imports. Plaintiffs submit that the Secretary's interpretation would limit the scope of coverage of the program only to those who manufacture goods. The Secretary's interpretation, plaintiffs contend, is at variance with the remedial nature of the trade adjustment assistance program. Plaintiffs urge the court to adopt a more expansive interpretation of the statute so as to effectuate the legislative intent. *Pemberton,* 639 F.2d at 800; *Fortin,* 608 F.2d at 525.

Finally, citing section 3(j) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(j) (1976), section 3 of the War Labor Disputes Act, 50 U.S.C. Appendix § 1503 (expired on December 31, 1946, 6 months after cessation of hostilities), and the *proviso* to section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4) (1976), plaintiffs argue that a retail distributor, like Capital Chrysler Plymouth, is engaged in production and, thus, is part of the production process. In construing the term "production" in the context of section 3 of the War Labor Disputes Act,[1] the Court of Appeals for the Seventh Circuit held a retail distributor to be engaged in production. *United States v. Montgomery Ward & Co.,* 150 F.2d 369 (7th Cir.1945). More recently, the Supreme Court considered the meaning of the word "produced" in the case of *N.L. R.B. v. Servette, Inc.,* 377 U.S. 46, 54–57, 84 S.Ct. 1098, 1103–1105, 12 L.Ed.2d 121 (1964). In the course of its examination of the term "produced" in the *proviso* to 29 U.S.C. § 158(b)(4),[2] the court found a wholesaler, although not directly involved in the physical process of creating or manufacturing products, to be in fact a producer of those products. Justice Brennan, speaking on behalf of the Court, stated:

The term "produced" in other labor laws was not unfamiliar to Congress. Under the Fair Labor Standards Act, the term is defined as "produced, manufactured, mined, handled, or in any other manner worked on * * *," 29 U.S.C. § 203(j), and has always been held to apply to the wholesale distribution of goods. The term "production" in the War Labor Disputes Act has been similarly applied to a general retail department and mail-order business. [Footnote omitted.]

*Servette,* 377 U.S. at 55–56, 84 S.Ct. at 1103–1104. Plaintiffs maintain that their interpretation of "produced", as used in section 222(3) of the Trade Act of 1974, is entirely consistent with that accorded the term in other federal statutes in the areas of labor and commerce.

A careful reading of *Fortin, supra,* discloses that it has limited application to the present action inasmuch as it focuses on the distinction between articles and services as contemplated by the Trade Act of 1974. Nowhere in *Fortin* does the court discuss what constitutes the *production* process, *i.e.,* the various levels in the chain of production.

*Pemberton,* however, is most instructive on this question. It is clear that production under section 222(3) requires the manufacture or creation of something tangible. The *Pemberton* test is whether the workers in question transformed articles into new and different articles.

It is difficult to quarrel with the reasoning of *Pemberton* for it cannot be questioned that to "produce" means to give birth, create or bring into existence.

There is no doubt that plaintiffs' work was performed on tangible articles, Chrysler cars. By their own admission, however,

1. Section 3, in pertinent part, provided for the seizure of "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith."

2. 29 U.S.C. § 158(b)(4).
     *    *    *    *    *    *

*Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public * * * that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer * * *.

plaintiffs did not manufacture new articles. Rather, their work consisted of adjustments and preparation of the tangible article which was also the end product. As in *Pemberton,* plaintiffs Woodrum, Johnson and Dorsey merely made repairs and serviced already completed articles. There is no evidence which indicates that plaintiffs made substantial changes to the new Chrysler cars resulting in their transformation into a new end product. For this reason, the Secretary concluded that plaintiffs' work constituted services, thereby rendering them ineligible for trade adjustment benefits.

It is true, as claimed by plaintiffs, that the remedial nature of the statute requires a liberal construction. *United Shoeworkers of Amer. v. Bedell,* 506 F.2d 174, 187 (D.C. Cir.1974). Yet, the legislative history cited by plaintiffs does not lead this court to the conclusion that the Secretary of Labor erred in his interpretation of the statute. The House and Senate reports show that Congress intended to liberalize the criteria for certification in that the *causal link* requirement was replaced by one mandating a lesser showing, *i.e.,* that increased imports "contributed importantly" to the petitioning workers' separation from employment. *See* H.Rep. No. 93–571, at 52–54; S.Rep. No. 93–1298, at 133. The legislative history shows clearly that Congress did not intend to expand the scope of coverage in the manner contemplated by plaintiffs. As the court noted in *Pemberton,* "semantics do not overcome the reality that nothing new is entered into the stream of commerce." 639 F.2d at 800. Plaintiff's broad interpretation would extend the trade adjustment assistance program beyond the limits prescribed by Congress.

Plaintiffs attempt to expand the definition of "produced" to include automobile dealerships by analogizing to other federal labor statutes. The Trade Act of 1974, particularly the trade adjustment assistance provisions, are vastly different in purposes and goals from the statutes relied on by plaintiffs. Consequently, the analogy is unhelpful and unavailing.

Finally, plaintiffs contend that the Fifth Amendment to the Constitution prohibits dissimilar treatment of similarly situated workers by the Secretary unless a rational basis exists for the discrimination. *See United States Department of Agriculture v. Moreno,* 413 U.S. 528, 532–533 n. 5, 93 S.Ct. 2821, 2824–2825 n. 5, 37 L.Ed.2d 782 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 446–447, 92 S.Ct. 1029, 1034–1035, 31 L.Ed.2d 349 (1972); *Lindsey v. Normet,* 405 U.S. 56, 77, 92 S.Ct. 862, 876, 31 L.Ed.2d 36 (1972).

Plaintiffs claim that in certifying eligibility for trade adjustment assistance benefits the Secretary has created two separate and distinct classes of automobile dealership employees. The first class includes those employees who work for dealerships controlled or substantially owned by an automobile manufacturer. The second includes those employees who work for dealerships which are independently owned and operated under a franchise agreement, such as Capital Chrysler Plymouth.

The Secretary's interpretation of section 222 has resulted in the certification of employees from the first class and denial of certification for the second class. The distinction is based on the fact that dealerships operated under a franchise agreement are not controlled or substantially owned by a firm which produces import-impacted articles.

Plaintiffs maintain that the distinction is not sustainable because the two types of dealerships are functionally identical. They stress that their employees perform the same work and fulfill the same role in the production process, *i.e.,* the final preparation of new cars prior to retail sale. The sole distinguishing feature is ownership of the dealership. Plaintiffs submit that a determination of eligibility on the basis of ownership bears no relation to the purposes and goals of the trade adjustment assistance program of the Trade Act of 1974.

Prior case law reveals that the Secretary has properly construed section 222(3) to exclude from its coverage workers for service firms not managed, owned or controlled by a manufacturing firm producing the im-

port-impacted article. *Pemberton, supra.* On occasion, the Secretary has certified service workers, but only where he has determined that they were integrated into the production of articles adversely affected by increased imports. The predicate for the determination is a finding that the petitioning workers were employed by a "firm" which produced, or had an "appropriate subdivision" which produced, the import-impacted article. The Trade Act of 1974, § 222(3).

The term "firm" is defined in 29 C.F.R. § 90.2 (1982) as follows:

* * * an individual proprietorship, partnership, joint venture, association, corporation (including a development corporation), business trust, cooperative, trustee in bankruptcy, and receiver under decree of any court. A firm, together with any predecessor or successor-in-interest, or together with any affiliated firm controlled or substantially beneficially owned by substantially the same persons, may be considered a single firm.

On the basis of this definition, an independently owned and operated automobile dealership which is not "controlled or substantially beneficially owned" by a domestic car manufacturer is not a part of the manufacturing firm. Hence, it is excluded from consideration as part of a "workers" firm or an "appropriate subdivision thereof" within the meaning of section 222(3).

The record leaves no doubt that Capital Chrysler Plymouth, plaintiffs' employing firm, is an independent franchised automobile dealership. Thus, the Secretary properly concluded that plaintiffs failed to satisfy one of the criteria necessary for an affirmative determination on certification.

Plaintiffs correctly state that the differentiation between the two classes of dealership employees can only be sustained if it is rationally or reasonably related to a legitimate governmental interest. *Moreno, supra; Eisenstadt, supra.* This differentiation in treatment, assuming plaintiffs satisfied all other eligibility requirements, does not result from an arbitrary, capricious or improper distinction by the Secretary be-

tween the two classes. Rather, it follows from a proper construction of the pertinent statute and a consistent application of a validly promulgated regulation, 29 C.F.R. § 90.2. Section 248 of the Trade Act of 1974, 19 U.S.C. § 2320 (1976), authorizes the Secretary of Labor to prescribe regulations for the implementation of the trade adjustment assistance program. In the court's view, the cited regulation comports with the intent of Congress as expressed in the statute to provide trade adjustment assistance only to workers of a firm which produces an import-impacted article.

There is no question that the legislative enactment is remedial in nature. Nevertheless, Congress intentionally set a limit on the extent of its remedial legislation affecting the adjustment assistance program. If anomalies or inequities exist in the law, permitting the certification of service workers in integrated manufacturing companies, but precluding certification of similarly situated workers in independent companies, they result from the express language of the statute. In the light of a carefully worded statute whose meaning is clear, the solution is not to be found in strained interpretation or judicial legislation.

In short, the distinction in the classification of workers who are eligible for trade adjustment assistance benefits is made in the statute itself, and no fault can be found with 29 C.F.R. § 90.2 or the Secretary's application of that regulation.

An attack upon the statute on constitutional grounds must also fail. The courts have consistently deferred to legislative determinations as to the desirability of statutory classifications in the regulation of economic activity and distribution of social welfare benefits. *Idaho Department of Employment v. Smith,* 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977). Clearly it is for the Congress, in the exercise of its judgment and discretion, to allocate funds in a way which will best promote and improve the general welfare. The courts may only intervene when the Congressional "choice is clearly wrong, a display of arbitrary power,

not an exercise of judgment." *Mathews v. DeCastro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976), quoting *Helvering v. Davis,* 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937). Even though a classification may lack mathematical precision, or may in practice result in some inequality, the court will sustain it, so long as the classification has a rational basis. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

The distinction in classes established by the statute and implemented by the Secretary's administration of the trade adjustment assistance program meets the "rational basis" standard applied in *Dandridge* and similar cases. Here, a "rational basis" is that it was reasonable for Congress to provide benefits to those workers whom it considered most immediately and directly affected by imports of like or directly competitive articles, namely, the employees of the firm producing the import-impacted articles.

The court, of course, is sympathetic to the plight of plaintiffs. However, it must be faithful to the legislative will and is "bound by what Congress has enacted." *Machine Printers and Engravers Ass'n v. Marshall,* 595 F.2d 860, 862 (D.C.Cir.1979). Furthermore, this interpretation of the statute, although not "authoritatively controlled" by judicial precedent, arises inevitably from the language of the statute as well as from the cases that have interpreted it. An amendment of the statute to correct a perceived shortcoming or inequity to include plaintiffs within its scope of coverage is not within the province of this court. As noted in *Bedell:*

> Congress has made a policy decision and drawn a line; our duty is to give the language of the statute a meaning that will carry out that policy. The result may appear harsh in this day of high unemployment and rising cost of living, but the remedy for congressional policies

that do not extend beyond lawful bonds is in the legislature.

506 F.2d at 187.

It is the determination of the court that the Secretary of Labor's denial of certification is supported by substantial evidence and is in accordance with the trade adjustment assistance provisions of the Trade Act of 1974. The determination of the Secretary is affirmed.