WESTERN CONFERENCE OF TEAMSTERS, PLAINTIFF *v.*
WILLIAM E. BROCK, SECRETARY, U.S. DEPARTMENT OF LABOR, DEFENDANT

Court No. 86-04-00436

(Dated September 12, 1990)

*James T. Grady,* General Counsel, International Brotherhood of Teamsters, Of Counsel, (*A. E. Lawson*) for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Jane E. Meehan*); *Gary Bernstecker,* United States Department of Labor, Of Counsel, for defendant.

OPINION

CARMAN, *Judge*: In *Western Conference of Teamsters v. Brock,* 13 CIT 169, 709 F. Supp. 1159 (1989) (*Teamsters I*) this Court remanded this action to the United States Department of Labor (Labor) to conduct a new determination regarding the petition of the Western Conference of Teamsters (plaintiff) for certification of eligibility for trade adjustment assistance benefits. At the conclusion of the remand proceedings, Labor issued a new determination denying plaintiff's petition. 54 Fed. Reg. 22,824 (May 26, 1989) (Third Negative Determination). As further explained below, after examination of Labor's remand determination this Court concludes that Labor's denial of certification of eligibility for trade adjustment assistance was based upon substantial evidence on the record and was otherwise in accordance with law. Accordingly, the Court affirms the remand results and enters judgment for Labor dismissing this case.

BACKGROUND

The extensive procedural and factual background of this case is set out fully in *Teamsters I,* familiarity with which is presumed. For the purposes of clarity, the Court will recount certain background information.

In this action plaintiff represents former employees of the eight sugar processing plants and the headquarters of the Great Western Sugar

Company (Great Western). Great Western processed sugar beets obtained under contracts with sugar beet growers into refined sugar that it sold primarily to soft drink producers and food manufacturers. In March of 1985, Great Western, formerly one of the nation's leading processors of sugar beets, closed its plants and filed for bankruptcy. R. 1 at 148, 163.[1]

Plaintiff, on behalf of the former Great Western employees, subsequently filed a timely petition for certification of eligibility for trade adjustment assistance with Labor. Labor denied plaintiff's application, initially and after two separate remands from this Court, based upon its determination that imports of articles like or directly competitive with refined sugar produced by Great Western did not contribute importantly to the workers' separation from employment and to the total decline in Great Western's sales or production within the meaning of 19 U.S.C. 2272(3) (1982 & Supp. IV 1986). *See* 50 Fed. Reg. 42,788 (Oct. 22, 1985); 52 Fed. Reg. 8,120 (Mar. 16, 1987); 54 Fed. Reg. 22,824.

In *Teamsters I*, this Court reviewed Labor's second negative determination upon remand and again remanded this action to Labor to determine whether raw sugar was directly competitive with refined sugar within the meaning of the statute. The Court also ordered Labor to explain its basis for distinguishing a prior determination in which Labor granted eligibility for adjustment assistance benefits to workers at Great Western's Longmont, Colorado plant based in part upon an examination of sugar prices. See 42 Fed. Reg. 43, 154 (Aug. 26, 1977). The Court ordered Labor in conducting its new determination to explain whether price and profitability were appropriate criteria for Labor to examine in deciding whether increased imports contributed importantly to the termination of production at Great Western's plants in this case. *See* 13 CIT at 183, 709 F. Supp. at 1170-71.

In due course Labor issued the Third Negative Determination, quoted at length below, reiterating its conclusion that increased imports did not contribute importantly to the workers' employment loss or Great Western's demise as a viable sugar processor. The determination stated in pertinent part as follows:

> The Department agrees that within the context of the definition of "like or directly competitive" as that term is used in the Trade Act, raw sugar may be considered like or directly competitive with refined sugar. However, the significance of this fact in the instant cases is tempered by the operation of the sugar price support program which effectively insulated raw sugar producers and through them processors, from injurious import competition.
>
> The price support program operated through quotas that limited raw sugar supply to achieve a target support price for sugar. The authority for setting the support price for sugar for the 1981–1985 crops was contained in the 1981 Agriculture and Food Act. The

---

[1] Throughout this opinion references to the administrative record of the initial negative determination are cited as R. 1 at ___. References to the third supplemental administrative record are cited as R. 4 at ___.

Market prices resulting from quotas were intended to yield prices sufficient to repay loans made to sugar processors by the Commodity Credit Corporation (CCC) and allow, but not guarantee, processors a profit. If price targets were not achieved, processors could forfeit the refined sugar as payment for the loans from the CCC.

As a participant and beneficiary in the price support program, Great Western was obligated to purchase domestically grown sugar beets at no less than a specified support level in order to borrow from the CCC. According to sugar experts in the Department of Agriculture, refined beet sugar market prices exceeded the loan rate for sugar beets in the period relevant to this investigation and Great Western should have been able to make a profit in excess of that which may have resulted from the target price level set by the program. Thus, petitioner's allegation that Great Western was unable to secure sugar beet acreage commitments because of low import prices is not supported by the facts.

The Department's denials in the instant cases were issued on October 7, 1985 when the domestic market was insulated from foreign competition. Sugar imports were restricted so as to increase sugar prices to the extent that processing companies sold sugar on the market rather than as payment for loans from the CCC. The average market price for refined beet sugar in the insulated Midwest market was 24.2 cents a pound in the last quarter of 1984; the raw sugar price in New York was 21.7 cents a pound and the average world price for raw sugar in the same period was 5.2 cents a pound. Further, U.S. Department of Agriculture data show the penetration of [high fructose corn syrup (HFCS)] into the domestic sugar/ HFCS market increasing from 1,046,000 tons in 1977 to 5,380,000 tons in 1985. The market penetration made by HFCS increased from 9.2 percent in 1977 to 41.5 percent in 1985. This fact is confirmed in the Department's survey of Great Western's customers which shows the large bottling companies greatly reducing their purchases of refined sugar from Great Western and shifting purchases to domestic HFCS.

The domestic sugar market applicable to the Longmont certification in 1977 differed substantially from that in which Great Western operated in the 1984/85 period. The Longmont certification was issued on August 16, 1977 when the domestic sugar market was for all practical purposes unregulated. When the Sugar Act[ ] expired on December 31, 1974, prices [sic] restrictions and quota levels were removed from sugar. As a result, domestic prices fell to the level of world sugar prices in response to the impact of an increased supply of sugar in a previously regulated market. World raw sugar prices dropped from 29.9 cents a pound average in 1974 to 8.1 cents a pound in 1977. Raw sugar prices in New York dropped from 29.5 cents a pound in 1974 to 11 cents a pound in 1977. In the unregulated market domestic refined sugar prices dropped from 32.1 cents a pound in 1974 to 15.1 cents a pound in 1977. It is clear that in the period applicable to the Longmont case world price levels were critical determinants of domestic prices and profitability. This was not true in the instant cases because quotas determined the level of do-

mestic prices as evidenced by the great disparity between [the] world and domestic price level noted above. Also, HFCS had not as yet made the competitive inroads on institutional users of sugar that are reflected in the instant situation on remand.

54 Fed. Reg. at 22,825.

## DISCUSSION

A negative determination by the Secretary of Labor denying certification of eligibility for trade adjustment assistance will be upheld if it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 2395(b) (1988); *see Woodrum v. Donovan*, 5 CIT 191, 193, 564 F. Supp. 826, 828 (1983), *aff'd, sub nom. Woodrum v. United States*, 2 Fed. Cir. (T) 82, 737 F.2d 1575 (1984). The findings of fact by the Secretary are conclusive if supported by substantial evidence. 19 U.S.C. § 2395(b). Substantial evidence has been held to be more than a "mere scintilla," but sufficient evidence to reasonably support a conclusion. *Ceramica Regiomontana S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (and cases cited therein), *aff'd*, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

Additionally, "the rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis." *International Union v. Marshall*, 584 F.2d 390, 396 n.26 (D.C. Cir. 1978). "To qualify for benefits, the statute requires a causal nexus between increased import penetration and the workers'[ ] separation. A causal nexus exists where there is a 'direct and substantial relationship between increased imports and a decline in sales and production.'" *Former Employees of Health-Tex. Inc. v. United States Department of Labor*, 14 CIT 580, Slip Op. 90–80 at 2 (Aug. 27, 1990) (quoting *Estate of Finkel v. Donovan*, 9 CIT 374, 382, 614 F. Supp. 1245, 1251 (1985)) (other citations omitted).

Plaintiff argues that the evidence in the record is insufficient to support Labor's departure from its previous analysis in the Longmont certification, that Labor failed to consider rising imports of raw sugar in its determination and that it was error for Labor to disregard any economic factors prior to the initiation in 1981 of the sugar price support program.

Labor contends its determination is based upon substantial evidence and is otherwise in accordance with law.

The Court finds that plaintiff's arguments lack merit. In its Third Negative Determination and the associated administrative record, Labor detailed the manner in which the sugar price support system established by Congress insulated the domestic raw and refined sugar market from the effects of increased imports. In effect, the complex price support system insured, through various tariff and non-tariff barriers, that the domestic price of sugar remained at artificially inflated levels. *See* Confidential Administrative Record (Conf. R.) 4 at 2; 54 Fed. Reg. at 22,825; *and see Defendant's Memorandum in Response to Plaintiffs' Objections to the Remand Determination*, at 8-21.

The record also makes it clear that the analysis used in the Longmont certification has no bearing on this case because the price support system was not in effect at that time. Indeed, it appears that the decision to eliminate sugar price supports and quotas in 1974 led to the collapse of the domestic sugar market that resulted in the Longmont certification. *See* 42 Fed. Reg. at 43,154-55. However, it is also apparent from the administrative record in this case that after Congress reinstituted the sugar price support mechanisms, the price of sugar rose to a level sufficient to allow Great Western to operate profitably during the period investigated. *See* Conf. R. 4 at 2; 54 Fed. Reg. at 22,825. Furthermore, there is ample evidence that Great Western's demise was caused, not by the effect of increased imports, but by management decisions and other factors not related to increased imports. *See e.g.*, Conf. R. 4 at 2-3.

CONCLUSION

Accordingly, the Court concludes that Labor's determination denying plaintiff's application for certification of eligibility for trade adjustment assistance pursuant to 19 U.S.C. § 2272(3), based upon its determination that increased imports did not contribute importantly to the workers' separation from employment, is based upon substantial evidence on the record and is otherwise in accordance with law. Plaintiff's motion for judgment upon the agency record is denied, Labor's negative determination is affirmed and this action is dismissed.