Slip Op. 03 - 21

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| FORMER EMPLOYEES OF PITTSBURGH LOGISTICS SYSTEMS, INC., | : : : | |
| | : | |
| Plaintiff, | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| v. | : | Court No. 02-00387 |
| | : | |
| UNITED STATES SECRETARY OF LABOR | : : | |
| | : | |
| Defendant. | : | |
| | : | |

[Secretary of Labor's negative eligibility determination for trade adjustment assistance remanded.]

Dated: February 28, 2003

*King & Spalding*, Washington, D.C. (*Lisa L. Cochrane*, *J. Michael Taylor, Stephen A. Jones*), for the plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, *Lucius B. Lau*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Paul D. Kovac*); *Louisa M. Reynolds*, Office of the Solicitor, U.S. Department of Labor, for the defendant.

## OPINION

The plaintiffs challenge the denial of their petition for trade adjustment assistance ("TAA") benefits. Section 222 of the Trade Act of 1974 (the "Act"), as amended and codified at the time[1] at 19 U.S.C. § 2272(a), required the Secretary of the U.S. Department of Labor, Office of Employment

---

[1] The plaintiffs' petition preceded the 90th day following the effective date of the Trade Adjustment Assistance Reform Act of 2002. *See* Pub. L. No. 107-210 § 151, 116 Stat. 933, 953-54 (Aug. 6, 2002).

and Training Administration ("Secretary," "Labor," and "ETA," respectively) to certify group

eligibility for TAA benefits if an investigation disclosed:

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated,
>
> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
>
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a). If any of these conditions was found not to exist, the ETA would deny TAA

certification. *See*, *e.g.*, *International Union, UAW Local 1283 v. Reich*, 22 CIT 712, 713, 20

F.Supp.2d 1288, 1290 (1998).

On February 16, 2001, the ETA found that "increases of imports of articles like or directly

competitive with steel produced by LTV Steel Company, Inc., Cleveland, Ohio, contributed

importantly to the decline in sales or production and to the total or partial separation of workers of

that firm" and certified workers at LTV's Cleveland plant for TAA benefits. TA-W-38,362 (Feb.

16, 2001).[2] *See* 66 Fed. Reg. 18117 (Apr. 5, 2001). The plaintiffs' job separation occurred at the

end of December 2001, when LTV Steel Company, Inc. ceased production and totally or partially

separated its employees. The plaintiffs were employed by Pittsburgh Logistics Systems, Inc. ("PLS")

and worked on-site at LTV's facilities in Independence, Ohio. On February 18, 2002, the plaintiffs

---

[2] TAA decisions referenced herein may be viewed for the time being on the internet at URL http://wdsc.doleta.gov/trade_act/taa/otaa/taadecisions/xxxxx.txt and substituting the relevant TA-W number for "xxxxx".

applied for TAA certification, claiming that they had been terminated as a consequence of LTV's

discontinuance of production.  PR Doc 1 at R 1.  The administrative record shows that the petition

was deemed "instituted" on March 25, 2002 and was denied four days later.  *Cf. id. with* PR Doc 7

at R 17 (TA-W-41,185) (Mar. 29, 2002).  Notice of the ETA's denial was published in the Federal

Register at 67 Fed. Reg. 18923 (Apr. 17, 2002).  *See* PR Doc 8 at R 20.  The ETA reasoned that "the

affected workers were engaged in employment related to the management of warehousing and

distribution services for steel manufacturing firms" and that "the workers of the subject firm did not

produce an article within the meaning of section 222 of the Trade Act of 1974."  PR Doc 7 at R 17-

18.  The ETA also denied the plaintiffs' petition for TAA certification as "service workers," stating

that it "has consistently determined that the performance of services does not constitute production

of an article, as required by the Trade Act of 1974 . . . ."  *Id*.  By way of further explanation, the ETA

reiterated its "traditional" interpretation that

> [w]orkers of the subject facility may be certified only if their separation was
> caused by a reduced demand for their services from a parent firm, a firm
> otherwise related to the subject firm by ownership, or a firm related by
> control.  Additionally, the reduction in demand for services must originate at
> a production facility whose workers independently meet the statutory criteria
> for certification and the reduction must directly relate to the product impacted
> by imports.

*Id*.

The plaintiffs timely applied for reconsideration pursuant to 29 C.F.R. § 90.18, *see* PR Doc

9 at R 24, 25, which was denied on May 30, 2002 on the ground that the closure of LTV was

> not relevant since the workers do not produce an article within the meaning
> of Section 222(3) of the Act.  The subject workers may be certified only if
> their separation was caused importantly by a reduced demand for their

services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control.

PR Doc 10 at R 27, 28. *See* 67 Fed. Reg. 40341 (June 12, 2002).

Thereafter, this action was initiated by Mr. Robert Weintzetl on behalf of the plaintiffs via a letter which was received by the Clerk of the Court on May 29, 2002 and deemed a challenge to those denials. King & Spalding accepted representation for the plaintiffs *pro bono* on or about June 24, 2002, and on September 5, 2002 filed an amended complaint, the thrust of which is that the ETA's investigation was inadequate and the determination is unsupported by substantial evidence on the record.

Now before the Court are the plaintiffs' motions to supplement the administrative record with certain declarations or in the alternative remand for further investigation, for judgment on the agency record under USCIT Rule 56.1, and for expedited oral argument. The government opposes the first two motions and, as ascertained by the Clerk of the Court, does not intend to respond to the third. The parties agree that the issue here concerns the third prong of 19 U.S.C. § 2272(a). The plaintiffs argue that they were a "PLS subdivision" consisting of former LTV workers and assert that they were under the *de facto* control of LTV and performing duties that were essential to the production of steel at LTV's facilities. Pl.s' Br. in Supp. of Mot. for Judgm. on Agency Record ("Pl.s' Br.) at 5, 20-21. Since LTV employees at LTV's Cleveland production facility and certain employees at the Independence facility were granted TAA eligibility, the plaintiffs argue that separated workers under LTV's control should also have been certified for TAA benefits.[3]

---

[3] Pl.s' Br. at 10, referencing TA-W-34,779, *Philadelphia, Bethlehem & New England Railroad, Bethlehem, PA; Notice of Revised Determination on Reopening*, 63 Fed. Reg. 54499 (Oct.
(continued...)

The plaintiffs assert that they first raised the above issues in their original petition and again in their request for reconsideration,[4] and they attach to their motion to supplement the declarations of Mr. Weintzetl and Mr. Robert Dunn, Chief Financial Officer for PLS and former representative on the LTV account to support their position. The government opposes introduction of matter outside the administrative record and argues that substantial evidence supports the ETA's determination. In view of the commendable quality of the briefs, the Court considers oral argument unnecessary, and for the following reasons grants the plaintiffs' motion to supplement and remands the matter to the ETA for further proceedings not inconsistent with this Opinion.

### *Discussion*

Jurisdiction is invoked pursuant to 19 U.S.C. § 2395(c) and 28 U.S.C. § 1581(d)(1). Judicial review of denial of TAA eligibility is pursuant to 19 U.S.C. § 2395(b), which provides in pertinent part:

> The findings of fact by the Secretary of Labor . . . , if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to such Secretary to take further evidence, and such Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall certify to the court the record of the

---

[3] (...continued) 9, 1998) (Secretary of Labor determination that employees of a subsidiary firm providing transportation services on behalf of a steel company's production facility were eligible for TAA benefits since TAA benefits had already been granted to workers at the production facility).

[4] Pl.s' Br. at 7. *See* PR Doc 2 at R 2-4 ("All the above Pittsburgh Logistics employees were integral to the operations of LTV Steel, and worked in the General Office of that Company"); PR Doc 9 at R 25 ("Our jobs were eliminated due to lack of work caused by LTV Steel CO. [*sic*] Inc. shutdown due to imports. Our company still exists, at other locations but there are no jobs available in this area, due to the shutdown of the only employer that the company dealt with in Cleveland Ohio.").

further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

*See also* 28 U.S.C. § 2640(c).

"Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938). A court must consider the totality of the evidence on the administrative record as a whole including that which fairly detracts from the agency's decision, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464 (1951), but since substantial evidence "is something less than the weight of the evidence, . . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, (1966).

I.

On the adequacy of the investigation, the government states at the outset that on-site investigations and personal interviews of every petitioner from all cases around the country is impracticable, and therefore investigators must rely upon the information provided by petitioners and their companies in making a certification recommendation. Def's Mem. in Opp. to Pl.s' Mot. for Judgm. Upon the Agency Record ("Def.'s Br.") at 5. The government justifies the ETA's decision in this instance in part based upon the "minimal information provided by plaintiffs in their petition materials" and upon the strict time constraints within which ETA must complete its numerous investigations. *Id*. at 6. By regulation, however, the ETA is obliged "to marshal all relevant facts to

make a determination on the petition[.]" 29 C.F.R. § 90.12. "To marshal" connotes ordering or mustering activity, certainly not passivity.

In general, the agency's choice of procedure to implement its assignment is a matter within its discretion,[5] but the ETA is obligated to conduct its investigation with the *utmost regard* for the interests of petitioning workers due to the *ex parte* nature of TAA proceedings and the remedial purposes of the statute. *See*, *e.g.*, *Former Employees of Marathon Ashland Pipeline, LLC v. Chao*, 26 CIT ___, 215 F.Supp.2d 1345, 1350 (2002); *Stidham v. United States Dep't of Labor*, 11 CIT 548, 551, 669 F.Supp. 432, 435 (1987). An inadequate investigation is not entitled to deference. *See*, *e.g.*, *Former Employees of Hawkins Oil and Gas, Inc. v. United States Sec'y of Labor*, 17 CIT 126, 130, 814 F.Supp. 1111, 1115 (1993). The question has been formulated as whether an investigation is so "marred" that an ETA finding is deemed arbitrary or of such a nature that it could not have been based on substantial evidence. *See*, *e.g.*, *Former Employees of Barry Callebaut v. Herman*, 25 CIT ___, 177 F.Supp.2d 1304, 1308 (2001); *certified after remand*, Slip Op 02-103, 2002 WL 31528611 (Aug. 30, 2002); *Former Employees of Linden Apparel Corp. v. United States*, 13 CIT 467, 469, 715 F.Supp. 378, 381 (1989). The developed record must evince substantial evidence to confirm or refute relevant issues encountered during the course of the investigation, and if an investigation does not pass a threshold of reasonable inquiry, the record is unsupported by substantial evidence. *See*, *e.g.*, *Former Employees of State Manufacturing Co. v. United States,* 17

---

[5] *See*, *e.g.*, *Former Employees of Champion Aviation Products v. Herman*, 23 CIT 349, 350 (1999); *Former Employees of Komatsu Dresser v. United States Sec'y of Labor*, 16 CIT 300, 303 (1992).

CIT 1144, 1148, 835 F.Supp 642, 645 (1993); *Former Employees of General Electric Corp. v. United States Department of Labor*, 14 CIT 608 (1990).

The Court reviews the administrative record for substantial evidence to support the determinations reached on a denial of TAA eligibility. 19 U.S.C. § 2395(b). *See* 28 U.S.C. § 2640(c). *See also Abbott v. United States Sec'y of Labor*, 3 CIT 54, 54 (1982). If the plaintiffs demonstrate that the record is inadequate, that may constitute "good cause" for remand, but good cause is not an independent standard permitting consideration of evidence outside the administrative record to prove the record's inadequacy. *De novo* evidence may serve to highlight the inadequacy, once that has been established.[6]

## II.

*Woodrum v. Donovan*, 5 CIT 191, 564 F.Supp. 826 (1993), stated that the "predicate" for certifying a petition "is a finding that petitioning workers were employed by a 'firm' which produced, or had an 'appropriate subdivision' which produced, the import-impacted article." 5 CIT at 199, 564 F.Supp. at 833. On that authority, the government argues that under either a

---

[6] *But, cf. Ammex v. United States*, 23 CIT 549, 62 F.Supp.2d 1148 (1999) (discussing CIT Rule 72(a)). The Court is nonetheless mindful of the fact that this matter involves investigation of a *pro se* petition. Judicial review of both TAA and social security benefits cases is based upon substantial evidence on the record and both specify remand for "good cause," *cf.* 19 U.S.C. § 2395(b) *with* 42 U.S.C. § 405(g), and the duty of the ETA investigator towards a *pro se* TAA petition may be likened to the duty of an administrative law judge towards a *pro se* social security benefits claim. An administrative law judge examining a *pro se* social security benefits claim has a duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Hennig v. Gardner* 276 F.Supp. 622, 624-25 (D.C. Tex 1967). This and similar refrains have been repeated in appellate level social security benefits cases. *See, e.g., Brock v. Chater*, 84 F.3d 726 , 128 (5th Cir. 1996); *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992); *McGill v. Sec'y of Health & Human Servs.*, 712 F.2d 28, 31-32 (2d Cir. 1983); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

"production" or "service" worker analysis, substantial record evidence supports the ETA's determination because the record does not support the plaintiffs contention that PLS is a "firm" engaged in steel production or an "appropriate subdivision" of a steel producer.[7] The government further maintains that once the ETA concluded that the plaintiffs' firm was not "the" producer of the import-impacted article "the analysis ends, without further consideration of the nature of [the] plaintiff[s'] work." Def's Br. at 15, referencing *Former Employees of Stanley Smith, Inc. v. United States Sec'y of Labor*, 20 CIT 201, 205, 967 F.Supp. 512, 516 (1996). Furthermore, the government argues, even if the "service" worker analysis was relevant the ETA's determination is correct because there is no evidence indicating "corporate control" or a "corporate connection" between PLS and LTV by way of "shared board of directors, shared assets, or any other indicia of a corporate relationship" and that simple control by LTV over employees' day to day activities is insufficient.

Central to the plaintiffs' claims is the relationship of their (respective) subdivision(s) to production at LTV, not the relationship of LTV to PLS (as a whole). The government's arguments rather attempt to place the production line for an import-impacted article within a single business entity, for example by referencing *Abbott v. Donovan*, 6 CIT 92, 99, 570 F.Supp. 41, 48 (1983) for the "well settled" principle that the determination of "appropriate subdivision"[8] is made along

---

[7] The government also notes that downsizing had begun at PLS's headquarters in Rochester PA in September 2001, and it references the plaintiffs' request for reconsideration, in which they note that PLS "still exists, at other locations . . . [,]" despite LTV's bankruptcy and the plaintiffs' separation. *Id.* at 3-4, referencing CR Doc. 6 at R 16; PR Doc 9 at R 25. The rest of the request for reconsideration reads: ". . . but there are no jobs available in this area, due to the shutdown of the only employer that the company [PLS] dealt with in Cleveland, Ohio." PR Doc 9 at R 25.

[8] By regulation:

"Appropriate subdivision" means an establishment in a multi-establishment

(continued...)

product lines.  It is true that "appropriate subdivision" equates to, and is therefore delineated by, the production line of the of the import-impacted article, but nowhere in the language of the statute is it implied that "appropriate subdivision" must be confined or defined in terms of a single business entity producing the import-impacted article.  The second prong of the statute mentions only "sales or production" of the firm or appropriate subdivision, and the third prong only refers to "articles produced" by the workers' firm or appropriate subdivision.  19 U.S.C. §§ 2272(a)(2)&(3).  A product line, or appropriate subdivision where the articles are produced, can encompass more than a single "establishment."[9]  *See Lloyd v. U.S. Dep't of Labor*, 637 F.2d 1267 (9th Cir. 1980); *International Union, UAW v. Marshall*, 584 F.2d 390, 394 n.15, 397 (D.C. Cir. 1978).  Those cases also indicate that "appropriate subdivision" requires a non-mechanical, flexible interpretation, and that is equally true of "firm," which by definition can encompass "partnership, joint venture, association, . . . cooperative," *et cetera*.  29 C.F.R. § 90.2.  *See id*.  Both must be interpreted as necessary to

---

[8] (...continued)

> firm which produces the domestic articles in question or a distinct part or section of an establishment (whether or not the firm has more than one establishment) where the articles are produced. The term "appropriate subdivision" includes auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities.
>
> * * *
>
> "Firm" includes an individual proprietorship, partnership, joint venture, association, corporation (including a development corporation), business trust, cooperative, trustee in bankruptcy, and receiver under decree of any court. A firm, together with any predecessor or successor-in-interest, or together with any affiliated firm controlled or substantially beneficially owned by substantially the same persons, may be considered a single firm.

29 C.F.R. § 90.2.

[9] "Establishment" (like the word "*firm*") connotes permanence. *See International Union, UAW v. Marshall*, 584 F.2d 390, 397 n.30 (D.C. Cir. 1978) (citation omitted).

encompass the distinct "parts" that relate to the "production" of the import-impacted article. Depending on circumstances, those parts may be separate business entities engaged in their respective roles in the common enterprise that produces the import-impacted article. This must be so, or the so-called "service" worker analysis, which attempts to effectuate section 222 of the Trade Act of 1974, and which essentially accomplishes the same result as the foregoing, *see* PR Doc 17 at R 17-18, would amount to an unlawful, *ultra vires* interpretation of the statutory language from which its authority derives.[10] And notwithstanding the government's reference to *Stanley Smith*, 20 CIT at 205, 967 F.Supp. at 515, the Court has acknowledged that the ETA does investigate whether petitioners may be eligible for certification as "service" workers if it determines that they did not participate in the production of an import-impacted article. *See*, *e.g.*, *Marathon Ashland Pipeline*, *supra*, 26 CIT at __, 215 F.Supp.2d at 1353; *Bennett v. U.S. Sec'y of Labor*, 20 CIT 788, 792 (1996); *Abbott v. Donovan*, *supra*, 6 CIT at 101, 570 F.Supp. at 49.

TAA was intended to benefit those who had been engaged in the production of an import-impacted article, and courts have noted the common meaning of "production," *i.e.*, to "give birth, create or bring into existence." *See*, *e.g.*, *Woodrum*, *supra*, 5 CIT at 198, 564 F.Supp at 831. In the abstract, the farmer, granger, miller, baker, driver, and grocer may *all* be said to relate to the production of bread to the ultimate consumer, but it is at least clear that "mere" repair and maintenance on an existing article, or work that does not involve transformation of a thing into something "new and different," will not suffice for TAA eligibility. *See*, *e.g.*, *Nagy v. Donovan*, 6 CIT 141, 145, 571 F.Supp. 1261, 1264 (1983). *See also Pemberton v. Marshall*, 639 F.2d 798 (D.C.

---

[10] This would apparently implicate Labor's interpretation of section 222 and the necessity for having a "service worker" analysis in the first place.

Cir. 1981). As for the remainder, the ETA must gerrymander "firm" and "appropriate subdivision" according to the product line that workers were involved in producing, whether under a "production" or "service" worker analysis, but it must do so consistently in considering each petition as it relates to the import-impacted article and provide a reasoned analysis and substantial evidence to support any determination. *See Marathon Ashland Pipeline*, *supra*, 26 CIT at ___, 215 F.Supp.2d at 1353. It has not done so here. Petitioners are required to provide *inter alia* "[a] description of the articles produced by the workers' firm or appropriate subdivision, the production or sales of which are adversely affected by increased imports, and a description of the imported articles concerned." 29 C.F.R. § 90.11(c)(7). Here, the import-impacted article is steel, and the plaintiffs petitioned that the article could not have been produced without their work. Proper delineation of the import-affected production line (*i.e*, "firm" and "appropriate subdivision") may or may not encompass the "PLS subdivision at LTV Steel." That depends on whether the tasks performed by the petitioners can be said to have been integrated into or, alternatively, integral to the production line. *Cf*. CR. Doc. 6 at R 16. (investigator's conclusion that the petitioners were not "involved in the production *process*") (italics added). The record does not evince substantial evidence to support the conclusion reached.

III.

The ETA's denial of eligibility on the "production" worker question relied on the finding that PLS "managed warehousing and distribution" and its denial of eligibility on the "service" worker question simply set out its usual interpretation of service worker eligibility.[11] Neither can be

---

[11] If petitioning former workers are not directly eligible for TAA benefits as "production" workers, consistent with its remedial statutory mandate the ETA may nonetheless certify eligibility for TAA benefits if

(continued...)

construed as a sufficient investigation into and analysis of how the plaintiffs' firm or subdivision did not relate to production of the product line at issue. The work of "manag[ing] warehousing & distribution" and "managing traffic and processing of freight invoices" does not *per se* resolve to work unrelated to production, and the determination provides no description of what the plaintiffs' actual job duties were. Similarly, it is not "performance of services" *per se* that may be considered ineligible for TAA benefits, it is the "performance" of "services" *unrelated to* the production of a tangible article that may be considered ineligible for TAA benefits. *See, e.g., Pemberton v. Marshall, supra*.[12] Production cannot occur without the "performance of services" by "workers" however labeled or tasked. If the ETA was attempting to distinguish the "output" of a worker or firm (*i.e.*, between production of a tangible thing and an intangible thing), it did so obliquely.

The ETA's determination must be addressed as it stands. While a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[,]" *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 442 (1974),

---

[11] (...continued)
> (1) their separation was caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control;
> (2) the reduction in the demand for their services originated at a production facility whose workers independently met the statutory criteria for certification; and
> (3) the reduction directly related to the product impacted by imports.

*See, e.g., Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor*, Slip Op. 02-131 (Oct. 28, 2002) at 23-24.

[12] *Pemberton* rejected the contention that the "appropriate subdivision" should be defined as encompassing both a shipbuilding yard and the appellants "repair and maintenance" shipyard. The court stated that "[t]he only relevant concern in determining whether a facility is part of the appropriate subdivision is whether it also produces the articles in question." 639 F.2d at 801.

it "may not supply a reasoned basis for the agency's action that the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577 (1947).  To the extent the government advocates sustaining the ETA's service worker determination on the basis of an interpretation that implies corporate control, the argument amounts to *post hoc* reasoning.  An agency's permissible interpretation of its own regulations may deserve substantial deference, *e.g., Mullins Coal Co. v. Director, OWCP*, 484 U.S. 135, 159, 108 S.Ct. 427, 440 (1987); *Former Employees of Bass Enterprises Production Co. v. United States*, 12 CIT 470, 473, 688 F.Supp. 625, 628 (1988), but in this instance the ETA only made the unsubstantiated conclusion that the duties of the petitioners involved "services" and stated that it "has consistently determined that the performance of services does not constitute production of an article[.]" If the ETA reached the issue of "control" on the service worker question, it did so only by virtue of repeating the broad standards it applies to petitioners seeking such certification. *See* PR Doc 7 at R 18.  That did not amount to an interpretation or application of "control" to the facts at hand.

On a denial of eligibility under either a "production" or "service" worker analysis, the ETA must explain to petitioners how their work was unrelated to production, and not merely state that it was.  It must provide a reasoned analysis in order to comply with section 2272 of the Trade Act of 1974.  *See Marathon Ashland Pipeline*, *supra*, 215 F.Supp.2d at 1353.  Where the conclusion upon which a determination is based is not merely a restatement of the obvious, courts have observed that reliance upon unverified statements of company officials may be permissible if it may be concluded that such persons were "in a position to know," *see, e.g., International Union, UAW Local 1283 v. Reich*, *supra*, 22 CIT at 723 n.15, 20 F.Supp.2d at 1297 n.15; *United Steel Workers of America,*

*Local 1082 v. McLaughlin*, 15 CIT 121, 122 (1991), however an unverified statement will not amount to substantial evidence if it is contradicted by logic or other pertinent information in the record. *See, e.g.*, *Former Employees of Shaw Pipe, Inc. v. United States Sec'y of Labor*, 20 CIT 1282, 1289, 988 F.Supp. 588, 592 (1997) (agency's statement that "pipe used for pipeline transmission could be used without the protective coating, but is not likely" found inherently contradictory and did not support finding that petitioners did not "create or manufacture a tangible commodity, or transform it into a new and different article").

The Court does not presume that the Employment Development Specialist ("EDS") located in Rochester who responded to the investigator's questions about the petitioners was "in a position to know" the extent of the petitioners' jobs in Independence. The ETA's findings were apparently based upon: (1) the investigator's note on the verification guide that PLS workers "managed warehousing & distribution," PR Doc 4 at R 11, and (2) the EDS's written statement that the plaintiffs were involved in "managing traffic and processing of freight invoices," CR Doc 5 at R 13. Yet, the EDS also stated in the same document to the ETA: "our employees were engaged in employment related to the production of a product" which "was steel, specifically carbon flat-rolled steel." *Id*. The record does not contain any notes or other memorabilia of investigatory effort to substantiate those statements, and it does not appear that the ETA followed up with the "contact" persons the plaintiffs had listed on the petition or with company officials after the data request was sent out, nor did the ETA issue any subpoenas.[13] In fact, it appears the petitioners were not contacted

_____

[13] It is at least apparent, as the government implies, that the ETA's investigator discovered information that lead to the questions posed to the EDS who responded on behalf of PLS. *Cf*. PR Doc. 4 at R 11 *with* CR Doc. 5 at R 13-14. However, the Court will not speculate on further effort

(continued...)

for further input at all, except by notice to them of their right to a public hearing and invitation to submit written comment. That may satisfy compliance with procedural due process, *cf. Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948 (1978), and it may well be that in a straight-forward case an investigator is justified in determining that further contact with petitioners is unnecessary to establishing all the relevant facts, in light of the circumstances of the particular petition, but that does not relieve the administrator of having the "utmost regard" towards petitioners, especially those unrepresented by counsel, when undertaking fact-finding.

The form petition requested the "complete name and address of the firm and each subdivision of the firm at which the workers for whom this petition is filed are (were) employed." PR Doc 2 at R 3. The petitioners listed by hand "Pittsburgh Logistics Systems" in Independence, Ohio and in Rochester, Pennsylvania, without distinguishing either "firm" or "subdivision." *Id*. The petition was signed by three former employees of PLS who stated they "were employed at Cleveland Ohio." *Id*. In addition to the three signatories, the record includes an "Addendum to Original Petition" listing the names, addresses, and separation dates of seven other individuals who had been employed in Ohio, a total of ten petitioners for group eligibility and none were Rochester personnel. *Id*. at R 5. Section III of the petition requested the name, address, telephone number, and title of a "company official" who could be contacted for "additional information" (*i.e.*, "someone knowledgeable about the firm's production, sales and employment"). The Addendum lists "Mr. Robert Dunn, Chief Financial Officer, The Quad Center, Rochester, PA" and his telephone number, as well as "Mr. Lee Diffenbaugher, Former General Mgr." and one of the petition's signatories, along with his address

---

[13] (...continued)
to support the ETA's foregoing (or forgone) conclusion.

and telephone number in Ohio. The "company" those individuals were listed as connected to was Quadrivius, not PLS. *Id*. at R 4.

The ETA's "Petition Screening and Verification Guide," a public document, lists the "subject firm" and the "appropriate subdivision address" as "Pittsburgh Logistics Systems, The Quad Center, Rochester, PA." *See* PR Doc 4 at R 11. It further lists "Quadrivius, Inc., The Quad Center, Rochester, PA" as the parent company of PLS. *Id*. The verification guide and the data inquiry indicate that on March 21, 2002 the ETA's investigator determined to contact the aforementioned EDS at "Pittsburgh Logistics Systems, The Quad Center, Rochester, PA." *See id*. ("Contact Official"); CR Doc 5 at R 13.

The EDS sent a response via facsimile transmission. The cover page is on the stationary of "Quadrivius Inc.," stated at the bottom to be a "holding company comprised of Pittsburgh Logistic Systems, Inc." and other companies. *Id*. at R 12. On the cover page the EDS provided name but not title or indication of connection to PLS. The data inquiry was addressed to the EDS at PLS in Rochester, PA, but the response provides no confirmation or corroboration that the EDS was employed by PLS as opposed to some other business entity at that address.

The first paragraph of the data inquiry describes that a petition had been filed for TAA on behalf of workers employed by PLS in Independence and Rochester. In response to the ETA's request to list the "full legal name and address of the firm and subdivision at which the workers were employed," the EDS listed the *firm* as Quadrivius, Inc. at its Rochester, Pennsylvania address and the *subdivision* as "Pittsburgh Logistics Systems Inc., c/o LTV Steel" in Independence, Ohio. *Id* at R 13. Responding to the question of how many employees had been laid off from "*your* firm in

Independence and Rochester," the EDS responded "eleven." *Id* at R 14 (italics added).  When asked

to briefly explain the circumstances relating to layoffs that have taken place in the last year, the EDS

responded "LTV had no purchase orders to fill, hence there was no work for *our* employees."  *Id*.

(italics added)  When asked whether "the workers in Rochester [were] in direct support of workers

in Independence[,]" the EDS responded in kind: "the workers in Rochester were not in direct support

of the workers in Independence."  *Id*.

The ETA's "Findings of Investigation" state that: (1) that the subject of the investigation is

"Pittsburgh Logistics Systems, on location at LTV Steel Corp in Independence, Ohio and Pittsburgh

Logistics Systems in Rochester Pennsylvania"; (2) PLS is a "subsidiary" of Quadrivius; and (3) both

Quadrivius and PLS are "based" in Rochester, Pennsylvania.  The EDS's response does not

constitute substantial evidence in support of the entirety of the foregoing, and it is unclear on the

record how those determinations were arrived at.  The EDS characterized "firm" and "subdivision"

as Quadrivius and "Pittsburgh Logistics Sys., Inc. c/o LTV Steel" respectively, and it is therefore

unclear whether the EDS was referring to PLS employees only when she responded that "eleven"

had been laid off from "your firm."  It is also, therefore, unclear whether the subdivision the EDS

listed was "based" or had any presence in Rochester, Pennsylvania.

Some support for the view that PLS was "based" in Rochester may be found on the petition

itself, which listed PLS as being in both Rochester and Independence, at least as the petitioners

understood it, and it is at least apparent that the parent holding company, Quadrivius, was located

in Rochester at the time in question.[14]  While the ETA is to be commended for including any PLS

_____

[14]  The Court further notes that Mr. Robert Dunn's declaration states that he is the CFO for
(continued...)

presence at Rochester in the scope of its investigation, the employment status of the eleventh "former employee" -- by implication a person who had been at offices at The Quad Center in Rochester since the ten other former employees were specifically named on the petition and located in Ohio -- is something of a mystery, since it is unclear, still, which entity the EDS was referring to when responding to "your firm" as opposed to Quadrivius or PLS. If there is other information upon which the investigator relied to confirm whether PLS was "based" in Rochester, Pennsylvania at the time in question, that information should be apparent on the record. Furthermore, substantial evidence does not support the ETA's assertion that "the affected workers were engaged in employment related to the management of warehousing and distribution services for steel manufacturing *firms*." PR Doc 7 at R 17 (italics added). *See* CR Doc 6 at R 15. The only evidence of record indicates that they were engaged in work for LTV. The record must evince more to support any presumptions, to which the ETA might otherwise be entitled, on its findings of fact.

The Court acknowledges that the ETA's resources may be stretched if inundated with TAA claims, and that it must comply with the pressure of short deadlines,[15] *see* 29 C.F.R. §§ 90.1--90.19;

---

[14] (...continued)
PLS (no address specified), but that is irrelevant to this part of the Opinion since that was not part of the administrative record and was listed as a Quadrivius officer on the petition's addendum.

[15] The plaintiff points out that the record of the investigation consists "only" of plaintiffs' submissions and copies of published notices plus a petition log sheet (PR Doc 1 at R 1), a one-page Petition Screening and Verification Guide (PR Doc 4 at R 11), a two-page letter, plus fax cover sheet, completed by PLS's spokesperson (CR Doc 5 at R 12-14), an investigative report consisting in substance of four paragraphs (CR Doc 6 at R 15-16), the Negative Determination (PR Doc 7 at R 17-19) (subsequently published), form letters to the petitioners informing them of the negative determination (PR Doc 11 at R 30-33), and the notice of negative determination regarding reconsideration (PR Doc 12 at R 34). It is, of course, quality and not quantity that is determinative, and the incompleteness on the pre-printed investigation sheet to which the plaintiffs draw attention
(continued...)

*see also*, *e.g.*, PR Doc 3 at R 6-9 (listing almost 100 petitions from locations throughout the United States in the same 3-5 month period as plaintiffs' petition); D. Billings, *DOL Statistics Show Significant Jump in Estimates of Job Losses Related to Trade*, 19 Int'l Trade Rep. (BNA) No. 8 at 309 (Feb. 21, 2002), but the Court cannot uphold a determination based upon manifest inaccuracy or incompleteness of record when relevant to a determination of fact. Viewing the record as a whole, the Court concludes that it is inadequate to support the determinations reached, and that it is necessary to remand the matter for additional proceedings. The plaintiffs' motion to supplement the administrative record is therefore granted, and upon remand the ETA shall incorporate the plaintiffs' declarations, which to this point have not been considered, into its analysis.

### III.

The plaintiffs claim that their work was integral to LTV steel production. The plaintiffs assert that they were responsible for overseeing the transport of coal, coke, lime, and limestone feedstock materials to LTV facilities via various modes of transport and that they were also responsible for the transportation of the product to customers, processors, and warehouses. Weintzetl Decl. ¶ 4, 8; Dunn Decl. Ex. A. *See* Pl.s' Br. at 4. To support their argument that they constituted "production" workers eligible for benefits, attached to Exhibit 4 of their brief is a published article quoting the director of procurement for a steel producer describing transportation management and logistics as a "key business process" that "work[s] with our commercial and operations groups[.]" Pl.s' Br. at 21, referencing Ex. 4, S. Robertson, *Wheeling-Pitt Outsourcing Cuts Logistics Costs*, American Metal Market, Oct. 4, 2002, at 4.

---

[15] (...continued)
is indicative of inadequacy as circumstances dictate. Here, the circumstances so dictate.

According to the plaintiffs' amended complaint and declarations, Mr. Weinzetl had been employed in LTV's Raw Materials Movement Group in 1984 when LTV established offices in Ohio and merged that group into its Steel Traffic Department. Weinzetl Decl. ¶¶ 4. *See id*. ¶ 5. The newly-reconstituted Steel Traffic Department thereafter coordinated the movement of both raw materials used by LTV in the production of steel and finished steel, via various transport modes. *See* Am. Compl. ¶ 7; Weinzetl Decl. ¶ 4, 6; Dunn Decl. ¶ 3. In 1995, LTV "outsourced" its Steel Traffic Department to PLS. The plaintiffs claim that all that changed from their perspective was the payor of their paycheck, that they otherwise "continued to perform essentially the same job duties, work in the same LTV facilities, and report to the same LTV management personnel[,] as before they were outsourced." Pl.s' Br. 4-5, referencing Am. Compl. ¶¶ 8-9; Weintzetl Decl. ¶ 7.

The plaintiffs also claim that as a "PLS subdivision" they were "integrated into the LTV corporate structure" and reported "directly to LTV employees on all operational matters." Pl.s' Br. at 5, referencing Weintzetl Decl. ¶¶ 7, 9; Dunn Decl. ¶¶ 4-8; and quoting Dunn Decl. ¶ 6. *See* Am. Compl. ¶ 11. The plaintiffs contend that LTV exercised the requisite level of "control" over their employment to satisfy the service worker test. For example, they assert, LTV managed all job tasks, directed which employees could work at specific locations and specifically relocated the PLS subdivision along with certain LTV facilities in Cleveland to LTV's facilities in Independence in July 2001, evaluated PLS employee job performance, and advised which PLS employees should receive merit salary increases. *Id.*, referencing Dunn Decl. ¶ 5 & PR Doc 4 at R 11.

The ETA's "service" worker analysis inquires, *inter alia*, whether workers were separated because their services were no longer needed by "a parent firm, a firm otherwise related to the

subject firm by ownership, or a firm related by control." The plaintiffs argue that LTV control over them satisfies the "firm related by control" prong. The plaintiffs argue that since TAA is determined by international trade, U.S. international trade law is appropriate for interpreting "control" in the context of the service worker analysis and 19 U.S.C. § 2272(a). *See* 19 U.S.C. § 1677(33) (in the antidumping and counterveiling duty context, "control" is presumed "if [a] person is legally *or operationally* is in a position to exercise restraint or direction over the other person") (plaintiffs' highlighting). They argue that TAA is remedial so it is appropriate to interpret TAA "control" in the context of the common law principles of master-servant, as is done in Title VII cases.[16]

The government argues that the ETA interprets "control" as *corporate* control and not simply control over employees' day to day activities. It argues that decisions of this Court on the service worker analysis support this interpretation. Def's Br. at 16, referencing *Woodrum*, 5 CIT at 199, 564 F. Supp. at 833 ("On the basis of this definition, an independently owned and operated automobile dealership which is 'not controlled or substantially or beneficially owned' by a domestic car manufacturer is not part of the manufacturing firm . . ."). The government contends the record of this matter shows no relationship between LTV and PLS other than a contractual one.

---

[16] Pl.'s Br. at 12, quoting *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979) (determining employment relationships under Title VII of the Civil Rights Act of 1964):

> [T]he extent of the employer's *right to control the 'means and manner' of the worker's performance is the most important factor* to review here, as it is in the common law and in the context of several other federal statutes. If an employer has the right to control and direct the work of an individual, not only as to the result achieved but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

613 F.2d at 832-33.

The plaintiffs respond that *Woodrum* rather supports their position because the case was remanded to ETA with instructions to conduct an investigation into both the *ownership* of the firm for which the plaintiffs worked as well as the *nature of the work* performed by the plaintiffs, which the ETA had failed to investigate. *Id*. at 15, referencing *Woodrum*, *supra*, 5 CIT at 199, 564 F.Supp. at 832-33 ("the Secretary has properly construed section 222(3) to exclude from its coverage workers for service firms not *managed*, *owned*, *or controlled* by a manufacturing firm producing the import-impacted[ ] article.") (plaintiffs' highlighting).  To further support their view, the plaintiffs argue that their circumstances are analogous to two recent decisions granting TAA certification.  In TA-W-39,535,[17] according to the plaintiffs, the ETA certified the former workers of three separate "subdivisions" of Computer Sciences Corporation working on-site at different locations of DuPont Corporation.  The plaintiffs call attention to the fact that those petitioners were former employees of DuPont that DuPont had chosen to outsource to Computer Sciences Corporation, an entity apart from DuPont, for "business reasons."  In TA-W-40,910,[18] according to the plaintiffs, those former employees who received certification were employed by Stein Mill Services, Inc., a company

---

[17]  TA-W-39,535, A & B (Feb. 19, 2002) ("*Computer Sciences*") ("Upon examination of the data supplied by the applicant, it became apparent that the Computer Science Corporation contract workers were engaged in employment related to the production of polyester fiber at Dupont plants under an existing TAA certification.").  *See Computer Sciences Corp., at Dupont Corp., Cooper River Plant, Charleston SC; Computer Sciences Corp., at Dupont Corp., Cape Fear Plant, Wilmington NC; Computer Sciences Corp., at Dupont Corp., Kinston Plant, Kinston NC.; Notice of Revised Determination on Reconsideration*, 67 Fed. Reg. 10767 (Mar. 8, 2002).  *See also* TA-W-39743, A, B, C & D (Jan. 3, 2002).

[18]  TA-W-40,910 (Apr. 29, 2002).  *See Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance*, 67 Fed. Reg. 35142 (May 17, 2002) (Stein Steel Mill Services, Inc Employed at LTV Steel, Inc. Cleveland Ohio).

unrelated to LTV, and were engaged in the "*processing* of slag and scrap" from LTV's steelmaking operations at Cleveland, Ohio. Benefits were awarded because they were determined to have been involved in the "production" of an article. Such decisions, the plaintiffs argue, are precedent for determining that their job duties were integral to the "production" of an import-impacted article and that the ETA's investigation of their own circumstance was inadequate.

The government distinguishes *Computer Sciences* on the ground that the ETA concluded that those former workers were considered "production" workers and not "service" workers. *See* Pl.s' Br., Ex. 5 at "Attachment 2" (Computer Sciences company contracted to provide "systems and technical support" for computers that controlled production process at production plants; petitioners certified as "production" workers).[19] It argues that the facts here are more akin to those of *Stanley Smith*, *supra*, which concerned former workers who had provided security services for the Trojan Nuclear Power plant in Rainer, Oregon, owned and operated by Portland General Electric ("PGE"). Trojan's cessation of production was attributable to an import-impacted "article" (electricity). Terminated PGE employees received TAA, however the 120 Stanley Smith employees did not. They brought suit invoking the authority of *Abbott v. Donovan*, *supra*, and in affirming denial of their petition the court appeared to focus on the fact that the plaintiffs' employer was not PGE.

The plaintiffs here, in turn, distinguish *Stanley Smith* on the ground that it is unclear whether the employees were "outsourced" by their former employer. They also point out that PGE had "no

---

[19] The Court further notes that workers engaged in "development work" at LTV's Technology Center in Independence received TAA benefits, TA-W-40,724 (Mar 21, 2002), along with workers at "LTV Railroad Companies" including Cuyahoga Valley Railway Co., River Terminal Railway Co., and Chicago Short Line Railway Company, TA-W-40,786 & A, B (Jan. 14, 2001), and Loraine Pellet Terminal, Loraine, OH, TA-W-41,030 (Feb. 8, 2001). *See* 67 Fed. Reg. 15224 (Mar. 29, 2002).

authority" over the employees and did not supervise or train them and that they were not "involved" in the production of electricity. *Id*. at 13, referencing 967 F.Supp. at 514. Furthermore, the plaintiffs point out, that court specifically noted that the claimants did not allege that they had been affiliated with, controlled, or owned by PGE. *Id*., referencing 967 F.Supp. at 516 n.10. The plaintiffs maintain that their own situation is different in that they constitute a discreet "outsourced" group from LTV and that they *are* alleging what the claimants in *Stanley Smith* did *not*.

The "service" worker analysis concerns "a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control." "Control" is not synonymous with "ownership." It is the power to manage or direct. *See Spirides v. Reinhardt*, *supra*, 613 F.2d at 832-33. *Cf*. 19 U.S.C. § 1677(33); 29 C.F.R. § 90.2 (a "firm . . . together with any affiliated firm controlled or substantially beneficially owned by substantially the same persons[ ] may be considered a single firm."). Congress was more concerned with remedying job losses as the result of import competition than with piercing corporate veils. *See* 19 U.S.C. § 2102(4) (the "purposes of this chapter" include, *inter alia*, assistance to "industries, firm, [*sic*] workers, and communities to adjust to changes in international trade flows"). The relevant inquiry on this trade adjustment assistance petition is whether petitioners were engaged in jobs that were integrated into or integral to "production" of steel at LTV facilities and that were lost due to import competition.[20] Whether such jobs were outsourced would strengthen the argument for eligibility, but, regardless, the focus is on which entity exercised actual control over them, not which entity nominally staffed them. *See* TA-W-39,535, *supra*.

---

[20] The government's argument on the *Computer Sciences* petition (TA-W-39,535) rather highlights that straightforward interpretation and application of the TAA statute would appear to render the so-called "service" worker analysis, an adjunct inquiry, unnecessary.

### *Conclusion*

For the foregoing reasons, this matter shall be remanded to the U.S. Department of Labor, Office of Employment and Training Administration, for redetermination consistent with this Opinion of whether the plaintiffs were eligible for TAA benefits, either as "production" workers or "service" workers. Or both.

_____
R. KENTON MUSGRAVE, JUDGE

Dated: February 28, 2003
      New York, New York